**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANE DOE (A.S.F.), AN INDIVIDUAL<br><br>Plaintiff,<br><br>v.<br><br>WYNDHAM HOTELS & RESORTS, INC. F/K/A WYNDHAM WORLDWIDE CORPORATION, WYNDHAM HOTEL GROUP, LLC, SUPER 8 WORLDWIDE, INC, AND SHAILEY ENTERPRISES, L.C. D/B/A SUPER 8.<br><br>Defendants. | CIVIL ACTION NO: 1:25-cv-1550 |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Jane Doe (A.S.F.), Plaintiff in the above-styled and numbered cause, files this Original Complaint against WYNDHAM HOTELS & RESORTS, INC. F/K/A WYNDHAM WORLDWIDE CORPORATION, D/B/A SUPER 8 HOTEL, WYNDHAM HOTEL GROUP, LLC, SUPER 8 WORLDWIDE, INC, AND SHAILEY ENTERPRISES, L.C. D/B/A SUPER 8, as Defendants, and would respectfully show the Court and jury as follows.

## SUMMARY

1. Jane Doe (A.S.F.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a

1

commercial sex act through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

3.    Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[2] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[3]

4.    Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use more subtle forms of fraud and coercion.[4] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These techniques can include high levels of control, exposure to chronic stress and threat, isolation, provocation of fear, and the creation of a sense of helplessness in victims.[5]

5.    Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

[2] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking

[3] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/

[4] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking

[5] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).

6.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

7.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

8.      Jane Doe (A.S.F.) alleges that Defendants derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including Jane Doe (A.S.F.), with minimal risk of detection or interruption. Jane Doe (A.S.F.) further alleges that Defendants continued providing support for traffickers, including her own trafficker, despite obvious and apparent signs of sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

9.      Defendants had the knowledge and opportunity to prevent the severe and permanent harm that Jane Doe (A.S.F.) experienced as the result of continuous sexual exploitation. Defendants failed to do so. Instead, Defendants benefited from facilitating that sex trafficking. Accordingly, Jane Doe (A.S.F.) files this lawsuit.

## PARTIES

10.     Jane Doe (A.S.F.) is a resident of New York. She may be contacted through her lead counsel, whose information is contained below.

11.    (A.S.F.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud, or coercion, to commit a commercial sex act.

12.    Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of (A.S.F.)

13.    Wyndham Hotels & Resorts, Inc., f/k/a Wyndham Worldwide Corporation ("WHR") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It may be served through its registered agent for service Corporate Creations Network Inc., at 3411 Silverside Road, Rodney Building #104, Wilmington, Delaware 19810, or wherever it may be found. Defendant WHR is the successor entity to the hotel business of Wyndham Worldwide Corporation and its former subsidiaries. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the subject Super 8. All references to WHR include the acts and omissions of predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

14.    Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. It may be served through its registered agent, Corporate Creations Network, Inc., at 1521 Concord Pike, Suite 201, Wilmington, DE, 19803, or wherever it may be found. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation.

15.    Super 8 Worldwide, Inc. ("S8W") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. It may be served through its registered agent, Corporate Creations Networking, Inc., at 1521 Concord Pike, Suite 201, Wilmington, DE

19803, or wherever it may be found. Upon information and belief, S8W is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation.

16. All references to WHR, WHG, and S8W include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Wyndham Hotels and Resorts, Inc. now or at any time relevant to the claims herein.

17. WHR, WHG, and S8W are referred to collectively as the "Wyndham Brand Defendants," "Wyndham" or "Franchisor Defendants."

18. Upon information and belief, the Wyndham Brand Defendants, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the hotel located at 1010 W. Ocean View Ave., Norfolk, VA 23503.

19. Defendant Shailey Enterprises, L.C. d/b/a Super 8 is a Virginia company with its principal place of business in Virginia. Defendant Shailey Enterprises, L.C d/b/a Super 8 during the period at issue, owned, operated, controlled, and/or managed the Super 8 located at 1010 W. Ocean View Ave., Norfolk, VA 23503, through the Wyndham franchising system. Shailey Enterprises, L.C may be served through its registered agent, Darshak Patel, 2802 Atlantic Ave, Virginia Beach, VA, 23451, or wherever he may be found. Shailey Enterprises, L.C will be referred to herein as "Franchisee" or "Franchisee Defendant."

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

22.     All Wyndham Defendants have the same principal place of business, which is in Parsippany, New Jersey, within the District of New Jersey. Therefore, each of the Wyndham Defendants is a resident of the District of New Jersey for the purpose of § 1391(b)(1).

23.     Under 28 U.S.C. § 1391(c)(2), Franchisee is a resident of New Jersey for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over each Franchisee.

24.     Under § 1391(d), Franchisee is a resident of New Jersey for the purpose of § 1391(b)(1) because, if the District of New Jersey was a separate state, Franchisee's contacts with the district would be sufficient to subject it to personal jurisdiction.

25.     Plaintiff's claims against Franchisee arise out of Franchisee's contacts with New Jersey through Franchisee's relationship with the Wyndham Defendants, which has its principal place of business in the District of New Jersey. Franchisee's participation in a venture with the Wyndham Defendant operating the subject hotel occurred, in substantial part, in New Jersey because upon information and belief:

     a.  Franchisee actively sought out a franchising relationship by contacting the Wyndham Defendants in New Jersey;

     b.  Franchisee acknowledged that the negotiation, execution, and acceptance of the franchising agreement occurred in the District of New Jersey;

     c.  Franchisee agreed that its ongoing performance of the franchising agreement would take place, in part, in the District of New Jersey;

     d.  The franchising agreements had a choice of law provision selecting the law of New Jersey as the governing law;

e. The franchising agreements required Franchisee to report information to the Wyndham Defendants in New Jersey, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like Jane Doe (A.S.F.);

f. Franchisee agreed to submit all notices required under the franchising agreement to the Wyndham Defendants in the District of New Jersey;

g. Franchisee was required to attend training and meetings in New Jersey;

h. The Wyndham Defendants dictated policies related to safety, security, human trafficking, employee training and Franchisee's response, as well as other subjects from their principal place of business in the District of New Jersey;

i. Franchisee had an ongoing obligation to participate in centralized programs operated by the Wyndham Defendants from their principal place of business in the District of New Jersey;

j. Franchisee was required to purchase insurance on behalf of one or more New Jersey entities (the Wyndham Defendants);

k. Reservation information for rooms at the subject motel passed through a system operated and managed by Wyndham from its principal place of business in New Jersey;

l. Payment information for rooms at the subject motel passed through a system operated and managed by Franchisor in New Jersey;

m. The benefit that Franchisee received from room rentals was governed by the New Jersey franchising agreement;

n. Franchisee agreed to make all payments due under the franchising agreement at the Wyndham principal place of business in the District of New Jersey;

o. Franchisee's operation of the subject motel were controlled and/or influenced by many policies set and enforced by the Wyndham Defendants from their principal place of business in Parsippany, New Jersey; and

p. Franchisee signed a software licensing agreement with the Wyndham Defendants for the property management software the Wyndham Defendants required Franchisee to use when operating the motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms. Franchisee agreed to file any lawsuit arising from the licensing agreement in the Eastern District of New Jersey and waived personal jurisdiction and venue objections;

7

26.     Upon information and belief, Priya Realty, Corp. contractually consented to jurisdiction in the District of New Jersey.

## FACTS

**I.      Jane Doe (A.S.F.) is a Survivor of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendants.**

27.     Jane Doe (A.S.F.) met her trafficker in 2014. Her trafficker pretended to be romantically interested in her and made her believe that he cared about her. However, Jane Doe (A.S.F.)'s turned violent, forced her into trafficking through physical abuse. Jane Doe (A.S.F.) was terrified of her trafficker and feared he would kill her if she tried to escape. From January 2014 through 2017, Jane Doe (A.S.F.) was forced to engage in commercial sex acts numerous times a day by her trafficker physically and mentally abusing her. Jane Doe (A.S.F.) feared for her life.

28.     Throughout February 2015, Jane Doe (A.S.F.) was continuously and unlawfully trafficked at the Super 8 located at 1010 W. Ocean View Ave., Norfolk, VA 23503 ("Subject Super 8"). Jane Doe (A.S.F.) was trafficked through force and coercion by her trafficker and required to engage in numerous commercial sex acts for his financial benefit.

29.     Jane Doe (A.S.F.)'s sexual exploitation repeatedly occurred in rooms of the Subject Super 8 and was facilitated by the Wyndham Brand Defendants and Franchisee Defendant.

30.     There were obvious signs that Jane Doe (A.S.F.) was being trafficked at the Subject Super 8 such that the Wyndham Brand Defendants and Franchisee Defendant knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

31.     Some of the obvious signs of Jane Doe (A.S.F.)'s trafficking at the Subject Super 8 included the fact that hotel staff would alert Jane Doe (A.S.F.) and her trafficker if the police were near the area; the do not disturb sign was constantly on the door to the room being used;

8

housekeeping was constantly refused; an excessive amount of towels and sheets were requested at the front desk; Jane Doe (A.S.F.) exhibited physical signs of abuse; and there was constant heavy foot traffic in and out of her room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

32.     At relevant times, Shailey Enterprises, L.C. owned, operated, and managed the subject Super 8 and employed the staff at the Subject Super 8 through the franchising system of the Wyndham Brand Defendants.

33.     At all relevant times, the Wyndham Brand Defendants were directly involved in the relevant operations of the Subject Super 8 and exercised systemic control over Shailey Enterprises, L.C. with respect to operation of the Subject Super 8 such that Shailey Enterprises, L.C. were the Wyndham Brand Defendants' actual agents for operation of the Subject Super 8. The Wyndham Brand Defendants also retained control over aspects of the operations of the Subject Super 8 directly related to the claims of Jane Doe (A.S.F.)

34.     The trafficker of Jane Doe (A.S.F.) and other sex traffickers frequently used Wyndham branded hotels for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of the Subject Super 8.

## II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

35.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Wyndham Defendants knew or should have known regarding the trafficking at their hotel properties, the specific trafficking activity that resulted in the trafficking of Jane Doe (A.S.F.) was pervasive and apparent at the Subject Super 8.

36.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[6] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[7] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[8] Hotels have been found to account for over 90% of the commercial exploitation of children.[9]

37.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[10]

38.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[11]

---

[6] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[7] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[8] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[9] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[10] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[11] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children,

39.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[12]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

---

https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

[12] *See Id.*

11

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

40.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[13]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

41.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[14] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

42.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants may attempt to draw a distinction between commercial sex or prostitution and sex trafficking, but they have long understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[15]

43.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and

---

[13] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[14] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[15] *Id.*

12

enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

44.    All Defendants were specifically aware that commercial sex in a hotel environment, involving a "pimp," implicitly involves to sex trafficking. Defendants received training and guidance on this. Defendants knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of sex trafficking. Reasonable diligence required Defendants to avoid benefiting from the rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

45.    The most effective weapon against sexual exploitation and human trafficking is education and training.[16] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[17]

46.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[18]    In reference to companies like the

---

[16] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[17] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[18] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

47.    Given the prevalence of sex trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

48.    Each of the Wyndham Defendants and Franchisee Defendant had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

49.    Unfortunately for Jane Doe (A.S.F.), the promises made by the Wyndham Defendants and Franchisee Defendant have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (A.S.F.)

## III.    Sex Trafficking Has Long Been Prevalent at Defendants' Hotel Properties, and Defendants Have Known About It.

50.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (A.S.F.)'s trafficking, that sex trafficking was ongoing and widespread at its properties.

### A. Sex Trafficking at Wyndham Branded Hotels was well Known by Wyndham Brand Defendants.

14

51.     Use of Wyndham branded properties, including Super 8 properties, for sex trafficking is well known to Wyndham.

52.     Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[19] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[20] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[21]

53.     Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[22]

54.     The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to take steps to stop facilitating trafficking, this promise

---

[19] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[20] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[21] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[22] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

15

proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[23]

55.    In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[24]

56.    Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Brand Defendants' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, Wyndham monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels, including:

- In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Super 8 in California.[25]

- In November 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Super 8 Motel in Virginia.[26]

- In January 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Florida Super 8 Motel.[27]

- In June 2011, an MS-13 gang member was indicted for trafficking girls at a Super 8 Motel near Washington, D.C.[28]

- In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Super 8.[29] In December 2012, a man

---

[23] https://endsexualexploitation.org/wyndham/

[24] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

[25] https://www.wired.com/2010/11/epps/

[26] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671

[27] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm

[28] https://www.thepublicdiscourse.com/2011/10/4034/

[29] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635

was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Super 8 Motel in Oklahoma.[30]

- In April 2013, two were arrested for trafficking a juvenile girl at an Illinois Super 8.[31]

- In June 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Super 8 Motel.[32]

- A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Super 8 Motel.[33]

- In 2013, a man was arrested at a Super 8 in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[34]

- In September 2013, a Super 8 motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[35]

- In November 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Super 8 Motel in Texas.[36]

- In March 2014 a sex trafficking task force arrested four in a Portland area sweep of a Super 8.[37]

- In June 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Super 8.[38]

---

[30] Man faces new sex-trafficking charges, Tulsa World (Oklahoma ) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671

[31] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-at-motel/article_98edf1d4-d231-5ea1-a6b9-e71c83f44750.html

[32] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle

[33] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction

[34] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficing-investigation

[35] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sex-trafficking-in-mass-teens-disappearance-ece/35397014007/

[36] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php

[37] https://www.centralmaine.com/2014/03/03/sex_trafficking_task_force_arrests_4_in_portland_area_prostitution_sting/

[38] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old

17

- In November 2014, a man was charged in connection with a Lansing, MI based sex trafficking ring involving four 15- to 18-year-old girls who would meet customers at the Super 8 in Lansing.[39]

- In June 2015, a Texas man was arrested and charged with human trafficking and second degree kidnapping after a woman said she was forced to perform sexual acts and was being held against her will at a Baton Rouge Super 8.[40]

- In August 2015 a LaGrange Kentucky Police Department's Special Investigation Unit discovered an alleged human trafficking and prostitution ring at a Super 8 motel involving a 16-year-old girl.[41]

- In October 2016, two men were charged with human trafficking-related offenses after officers responded to a Super 8 Motel in Frederick, Maryland.[42] One was later sentenced to 25 years in prison for second-degree rape and three counts of human trafficking.[43]

- In January 2017 a man faced human trafficking charges after a sting at a Super 8 in Harrisburg, PA.

- In March 2017 a man was accused of running a prostitution ring involving Alvin ISD minors out of a Lake Jackson, TX Super 8.[44]

- In June 2017 a sex trafficking operation was busted at a Super 8 in Lakeland, TN.[45]

- In October 2017 a Texas statewide sex trafficking ring shut down multiple hotels, including a Super 8 in Fort Worth.[46]

- In August 2018 authorities investigated a human trafficking case involving a 16 year old boy who was found at a Super 8 in Duson, LA.[47]

---

[39] https://www.lansingstatejournal.com/story/news/local/2014/11/20/witnesses-face-lansing-man-charged-sex-trafficking-ring/70010754/
[40] https://www.wafb.com/story/29240032/texas-man-charged-with-human-trafficking-kidnapping-in-baton-rouge/
[41] https://www.lagrangenews.com/2015/10/03/alleged-human-trafficker-faces-charges/
[42] https://www.nbcwashington.com/news/local/two-charged-in-maryland-with-rape-human-trafficking-others/111815/
[43] https://www.fredericknewspost.com/news/crime_and_justice/courts/houston-man-sentenced-to-25-years-for-human-trafficking-in-frederick/article_81a5fa1e-598c-5431-b2f0-77dd49b1b545.html
[44] https://www.kgw.com/article/news/crime/man-accused-of-running-prostitution-ring-involving-alvin-isd-minors/285-424495364
[45] https://www.actionnews5.com/story/35657458/sex-trafficking-operation-busted-at-super-8-in-lakeland/
[46] https://tylerpaper.com/news/local/statewide-sex-trafficking-ring-shut-down-with-eight-arrests-including-some-tied-to-tyler/article_2db545e0-e48c-5c82-ace0-a7d27e746b96.html
[47] https://www.klfy.com/local/authorities-investigate-human-trafficking-case-involving-16-year-old-boy/

18

57. These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Brand Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

58. Upon information and belief, each of the Wyndham Brand Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific property where (A.S.F.) was trafficked.

59. Reviews of Super 8 branded properties, which upon information and belief each of the Wyndham Brand Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at its branded properties and the Wyndham Brand Defendants' knowledge of the same. For example:

- An August 2008 review of a Super 8 property in Arizona stated: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[48]

- A January 2010 review of a Super 8 property in Escondido, California stated: "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM, Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[49]

- A February 2010 review of a Super 8 property in Los Angeles, California stated: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks

---

[48] https://www.tripadvisor.co/Hotel_Review-g60950-d74409-Reviews-
Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html
[49] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-
Escondido_California.html

my advice is to utilize the buddy system whenever you leave your room to visit the vending machines... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[50]

- A June 2010 review of a Super 8 property in Virginia stated: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[51]

- A July 2010 review of a Super 8 property in Texas stated: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[52]

- An October 2011 review of a Super 8 property in Tennessee stated: "Don't stay here unless you want drugs or a prostitute....or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[53]

- A February 2012 review of a Super 8 property in Florida stated: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE!!"[54]

- An April 2012 review of a Super 8 property in Virginia stated: "Just beware, there are "escorts" who are constantly on the lookout for fresh meet. A pimp will knock on your door asking to use your cell to call his girlfriend. From then on, she will do the work."[55]

- An April 2012 review of a Super 8 property in Texas stated: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[56]

---

[50] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html

[51] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews

[52] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-Reviews-Super_8_by_Wyndham_Austin_North_University_Area-Austin_Texas.html

[53] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8_by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html

[54] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

[55] https://www.expedia.com/Manassas-Hotels-Super-8-By-Wyndham-Manassas.h12141.Hotel-Reviews

[56] https://www.tripadvisor.ca/Hotel_Review-g56003-d240483-Reviews-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html

- An October 2012 review of a Super 8 property in Florida stated: "the last time i stayed at this super 8, a hooker approached me in the parking lot and i informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[57]

- A March 2013 review of a Super 8 property in Louisiana stated: "There was a PROSTITUTE running her business from a room, with her pimp standing outside. She propositioned a co-worker as he was going to his room. Then in the middle of the night she and her clients were fighting very loudly over money and services issued!"[58]

- A March 2013 review of a Super 8 property in Ohio stated: "I've been solicited for drugs and by prostitutes here on several occassions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms."[59]

- A February 2013 review of a Super 8 property in Minnesota stated: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[60]

- An April 2013 review of a Super 8 property in Georgia stated: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[61]

- A July 2013 review of a Super 8 property in California stated: "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to turn tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children.Or anyone for that fact."[62]

[57] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

[58] https://www.tripadvisor.ca/Hotel_Review-g40314-d120851-Reviews-FairBridge_Inn_Express_Metairie-Metairie_Louisiana.html

[59] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

[60] https://www.tripadvisor.com/Hotel_Review-g43493-d247863-Reviews-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html

[61] https://www.tripadvisor.com/Hotel_Review-g34856-d217054-Reviews-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html

[62] https://www.tripadvisor.com/Hotel_Review-g32655-d252254-Reviews-or50-Super_8_by_Wyndham_Canoga_Park-Los_Angeles_California.html

- An August 2013 review of a Super 8 property in Ohio stated: "This hotel gives the Super 8 chain a bad reputation. The local restaurant management told us not to answer door due to prostitution issues."[63]

- An October 2013 review of a Super 8 property in Virginia stated: "We ended up wedging a pole in the door for safety reasons. After dark the place turned into, I do NOT exaggerate, a open hoer house. At lease 4 pimps were doing business with a dozen or so girls there. If not for the safety reasons it was a life experience seeing that side of society. We were surprised at a chain like Super 8 condoning this activity. . . . The big thing was the blatant open prostitution that was condoned by your chain was despicable. The car music blaring and loud laughing and yelling was just like out of a rap video. Shame on you Super 8 for condoning this kind of activity just to fill a room."[64]

- January 2014 review of a Super 8 in Lake Worth, FL states "Cops arresting drug dealers upon my arrival. Prostitutes. Very unsafe… Wasted money at super 8. Should have slept under a bridge instead!"[65]

- May 2014 review of a Super 8 in Houston, TX states "However, we have been staying here for a while on business and have noticed lots of young white women (who look and dress like prostitutes) with black men who appear to be their pimps and I've seen them using two rooms using one for "business". Staff should really be more aware of what's really going on here. Also, have smelled pot being smoked everyday and it just seems to be ignored by the staff as well."[66]

- June 2014 review of a Super 8 in Austin, TX states "What can I say? The rooms are small, the furniture tore up, refrigerator not cold, sink and tub would back up with water, carpet sticky, lights with no lampshades, and hookers and pimps running around with the management's blessing."[67]

- July 2014 review of a Super 8 in Norfolk, VA states "This place is in a cheaper end of town and the other guests looked like drunks and hookers hanging out in folding chairs on the balcony. Police were in the parking lot when we arrived."[68] Hotel management responded to this review on July 29, 2014.

---

[63] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

[64] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html

[65] https://www.expedia.com/Lantana-Hotels-Super-8-By-Wyndham-Lantana-West-Palm-Beach.h855762.Hotel-Reviews

[66] https://www.tripadvisor.com/Hotel_Review-g56003-d2531544-Reviews-Super_8_by_Wyndham_Houston_North_I_45-Houston_Texas.html

[67] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html

[68] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html

- October 2014 review of a Super 8 in Denver, CO states "The cleaning of the place was awful, prostitutes knocking on doors touting for business, the only reason i ended up staying there longer than a night was there was nowhere else. Will never go back again."[69]

- December 2014 review of a Super 8 in Augusta, GA states "My room was right beside permanent residents. Had a prostitute come in my room while i was trying to load luggage in my vehicle...NEVER again will I stay here!"[70]

- February 2015 review of a Super 8 in Pompano Beach, FL states "I thought of something positive, you won't have to go looking for a hooker... they are already staying there."[71]

- March 2015 review of a Super 8 in Houston, TX states "Awfull. Drug dealers and prostitutes everywhere. Hotel staff just let it happen. Saw one of them with a crack pipe. I couldn't stay. Didn't even stick around long enough to check in. I called the police to report what I saw going on. Bad bad bad. Stay away from tjis one."[72]

- April 2015 review of a Super 8 in Sacramento, CA states "Rooms were clean, but the smell of weed filled the hallways. Shady characters and possible prostitution activity were common throughout our stay. our Van door lock was broken, luckily we had nothing valuable inside. The front desk was friendly and courteous. I knew somethng was up when an armed security guard was present during check in."[73] Management responded to this review on April 12, 2015.

- May 2015 review of a Super 8 in Colarado Springs, CO states "I'm not sure if it was the blood in the shower or the homeless man camped out in the stairwell that caps the awfulness of this place but maybe it was the prostitute's post-coital walk of shame on our last night that did it. Either way, this stay - without hyperbole - was the worst paid-lodging stay I've had in at least a decade..."[74]

- July 2015 review of a Super 8 in Raleigh, NC states "The two nights we were there were almost frightening. There were prostitutes visting guests, they were couples having fist fights both nights. Some man was on the property in broad daylight screaming all kinds of profanity. There was homeless guy hanging out in the parking lot and pretty sure he helped himself to coffee int he lobby and nobody said anything. I called and complained twice about the man screaming and the guys

---

[69] https://www.tripadvisor.ca/Hotel_Review-g33388-d82976-Reviews-Super_8_by_Wyndham_Denver_Stapleton-Denver_Colorado.html

[70] https://www.expedia.com/Augusta-Hotels-Super-8-By-Wyndham-Augusta.h10194.Hotel-Reviews

[71] https://www.expedia.com/Fort-Lauderdale-Hotels-Super-8-By-Wyndham-Pompano-Beach.h856303.Hotel-Reviews

[72] https://www.expedia.com/Houston-Hotels-Super-8-By-Wyndham-HoustonDtwnI-610.h892798.Hotel-Reviews

[73] https://www.tripadvisor.com/Hotel_Review-g32999-d969149-Reviews-Super_8_by_Wyndham_Sacramento-Sacramento_California.html

[74] https://www.yelp.com/biz/super-8-by-wyndham-colo-sprs-garden-of-the-gods-colorado-springs

skating boarding on the walkway at 4:30 a.m. outside our door. The have no control over their property and will never stay there again!"[75]

- September 2015 review of a Super 8 in Austin, TX states "I was propositioned twice by hookers who had rooms in the building and saw two drug deals go down in the parking lot. There are people going through the parking lot and picking up the dealer and then drop him off in a couple of minutes. The girls are also hanging outside and when a car pulls up they get in with the guy. They return in a few minutes and drop her off. The guys never get out."[76]

- December 2015 review of Super 8 in Fort Myers, FL states "This hotel is not in a good area nor is it a good place to stay. there were drugs being sold in the hotel parking lot and prostitutes were all around the hotel. Not a safe place to stay."[77]

- April 2016 review of a Super 8 in Austin, TX states "I'm going to be more blunt here than other reviewers. This is a whore house they even rent rooms by the hour, I found this out when attempting to do early check in and they have me the hourly rates. The bathroom is filthy, aged and poor quality simply painted cement with cracks and scratches. It is in a rough neighborhood so watch out for your car. Drugs and prostitutes. I even saw two guys lingering in line outside a room waiting for their turn. Lastly I was awoken at 6:15am by a man who was yelling at and, from the sounds of it, beating a dog. The female occupant of the room was begging him to stop which resulted in a slap."[78]

- August 2016 review of a Super 8 in North Hollywood, CA states "There was prostitution going on. Overall service suck, not worth at all the $140 that I paid."[79]

- February 2017 review of a Super 8 in New Orleans, LA states "Location was terrible which made Uber rides a fortune. What they don't tell you is that it's located in the 8th ward and full of prostitution and drugs."[80] Hotel management responded to this review on March 8, 2017.

- May 2017 review of a Super 8 in Minneapolis, MN states "Pictures are nothing like the hotel. Prostitutes, drugs, a building and parking lot full of very unsavory people is what you will get."[81]

---

[75] https://www.tripadvisor.com/Hotel_Review-g49463-d94688-Reviews-Super_8_by_Wyndham_Raleigh-Raleigh_North_Carolina.html

[76] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html

[77] https://www.expedia.com/Fort-Myers-Hotels-Super-8-By-Wyndham-Fort-Myers.h49549.Hotel-Reviews

[78] https://www.yelp.com/biz/super-8-by-wyndham-austin-university-downtown-area-austin

[79] https://www.expedia.com/Los-Angeles-Hotels-Super-8-By-Wyndham-North-Hollywood.h916715.Hotel-Reviews

[80] https://www.tripadvisor.com/Hotel_Review-g60864-d120826-Reviews-Super_8_by_Wyndham_New_Orleans-New_Orleans_Louisiana.html

[81] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Super-8-By-Wyndham-Brooklyn-CenterMPLS.h124015.Hotel-Reviews

- August 2017 review of a Super 8 in Lake Worth, FL states "If you can afford to stay someplace else then do it!!! Please do not bring your children here. Drugs, prostitution, police every day, ambulances in and out for overdoses. It's cheap for a reason people."[82] Hotel management responded to this review.

- November 2017 review of a Super 8 in Los Angeles, CA states "This place is disgusting, it smelled like urine in most of the hotel including our room and there were men coming in and out through the stairway. I think there might have been prostitution going on Wyndham should be ashamed at this property is part of their chain."[83] Hotel management responded to this review on November 27, 2017.

- April 2018 review of a Super 8 in Columbia, SC states "This place was horrible!! The clerk was hanging out with I guess extended stay guests in the front parking lot when we arrived. Two girls that looked like prostitutes were hanging around. Not such a safe looking place."[84] Hotel management responded to this review on April 25, 2018.

- July 2018 review of a Super 8 in Garland, TX states "Dont stay here unless you have ltc... there is drugs prostitution and all they do not clean nothing and the pool sucked I had condoms in the night stand... I would never put the Wyndham name on this crap hole hotel."[85] Hotel management responded to this review on July 17, 2018.

- September 2018 review of a Super 8 in Austin, TX states "Then we went to the room where we met a prostitute at the stairs. Went into our room which smelled very badly of mold. The air ventilation was terrible - way below standard. We went to bed, had trouble sleeping because we felt unsafe and uncomfortable. The night was full of noice with the sex activities, cars arriving and leaving, yelling and screaming in the parking lot and doors were slamming."[86]

- December 2018 review of a Super 8 in Oklahoma City, OK states "very nasty rude staff unclean only waffles for breakfast. bathroom was nasty the toilet leaked.hookers were telling my son how much they charged do not stay here no matter how cheap. Thier were people yelling."[87] Hotel management responded to this review on December 22, 2018.

---

[82] https://www.expedia.com/Lantana-Hotels-Super-8-By-Wyndham-Lantana-West-Palm-Beach.h855762.Hotel-Reviews

[83] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html

[84] https://www.tripadvisor.com/Hotel_Review-g54184-d226843-Reviews-Super_8_by_Wyndham_Columbia-Columbia_South_Carolina.html

[85] https://www.tripadvisor.com/Hotel_Review-g55884-d241642-Reviews-Super_8_by_Wyndham_Garland_North_Dallas_Area-Garland_Texas.html

[86] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html

[87] https://www.tripadvisor.com/Hotel_Review-g51514-d243913-Reviews-or20-Super_8_by_Wyndham_Midwest_City_OK-Midwest_City_Oklahoma.html

60.    These reviews are examples. There are many similar online reviews for Super 8 branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from before 2012 that are not currently available on the internet but which the Wyndham Brand Defendants know about.

61.    These and other news stories, guest surveys, and online reviews show that the use of Wyndham and Super 8 hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of Wyndham and Super 8 hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

62.    Each Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Super 8 branded hotels, including the subject hotel, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Subject Super 8 frequently and long after the trafficking of the Plaintiff.

63.    This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (A.S.F.) was trafficked at the subject properties, Wyndham knew or should have known that:

    a.  The use of its branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

    b.  Commercial sex work occurring at its branded properties involved trafficking and compelled prostitution;

    c.  Their franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at its hotel properties;

    d.  Their efforts, if any, to stop facilitating sex trafficking in Wyndham branded properties were not effective; and

    e.  They were, by their acts and omissions, facilitating sex trafficking at Wyndham branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

64.     Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Wyndham chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**B. The Wyndham Brand Defendants and Franchisee had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Super 8.**

65.     Sex trafficking was widespread and pervasive at the Subject Super 8 specifically.

66.     The Wyndham Brand Defendants and Franchisee Defendant knew or should have known about the sex trafficking pervasive at the Subject Super 8 based on obvious indicators of this activity.

67.     Internet reviews for the Subject Super 8, which upon information and belief Wyndham Defendants and Franchisee Defendant manage and monitor, show the pervasiveness of sex trafficking before and well after Jane Doe (A.S.F.) was trafficked. For example:

- 2010 Expedia review states "…The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel…."[88]
- 2012 Expedia review states "…Seemed like a rough neighborhood. I couldn't be sure but it looked like femal escorts were working at this hotel…."[89]
- 2013 TripAdvisor review states "…After dark the place turned into, I do NOT exaggerate, a open hoer house. At lease 4 pimps were doing business with a dozen or so girls there. If not for the safety reasons it was a life experience seeing that side of society. We were surprised at a chain like Super 8 condoning this activity. …"[90]
- 2014 TripAdvisor review states "…This place is in a cheaper end of town and the other guests looked like drunks and hookers hanging out in folding chairs on the balcony..."[91]
- 2015 Expedia Review states "…We saw prostitutes and while walking down the hall someone actually asked my husband to borrow a lighter to light his pot pipe IN FRONT OF OUR CHILDREN! NEVER AGAIN!..."[92]

---

[88] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews
[89] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews
[90] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html
[91] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html
[92] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews

- 2019 Google review state "…Only good for crackheads and hookers."[93]

68.     Defendants knew that a population of traffickers, including Jane Doe (A.S.F.)'s traffickers, repeatedly chose to use the Subject Super 8 for their sex trafficking activity. They selected these hotels because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Subject Super 8. There were obvious signs of this activity, which were consistent with the well-known "red flags" for sex trafficking in the hospitality industry. As such, Defendants also knew or should have known about the pervasive sex trafficking at the Subject Super 8 based on obvious indicators of this activity.

69.     This population of traffickers, including (A.S.F.)'s trafficker, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

70.     Upon information and belief, there were other victims being trafficked at the Subject Super 8 at the same time as (A.S.F.), and there were obvious signs these victims were being trafficked.

71.     Based upon information and belief, the conduct of Defendants facilitated the trafficking of a number of victims by a population of multiple traffickers at the Subject Super 8. Defendants developed a continuous business relationship with this population of traffickers who operated at the hotel on a routine and repetitive basis.

---

[93]https://www.google.com/travel/hotels/Super%208%201010%20W%20Ocean%20View%20Ave,%20Norfolk,%20VA%2023503%20google/entity/CgoImpyRtNjYrsstEAE/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4926165,4926489,4928504,4930751,4930753,4931360,4936396,4937897,47061553&hl=en-US&gl=us&ssta=1&q=Super+8+1010+W+Ocean+View+Ave,+Norfolk,+VA+23503

72. Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Subject Super 8 prior to Jane Doe (A.S.F.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

73. All knowledge from the staff at the Subject Super 8 is imputed to Franchisee, which employed the hotel staff. Thus, Franchisee knew about the widespread and ongoing trafficking at the Subject Super 8, including the trafficking of Jane Doe (A.S.F.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to the Wyndham Brand Defendants based on the existence of an actual agency relationship as described below.

74. Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, both the Wyndham Brand Defendants and Franchisee learned or should have learned about the obvious signs of widespread trafficking at the Subject Super 8, based on non-public sources of information including but not limited to:

   a. surveillance of the property;

29

b.  internal investigations;

c.  customer complaints;

d.  monitoring of customer feedback;

e.  information received from law enforcement;

f.  and other sources of non-public information available to Franchisee.

75.    Upon information and belief, the Wyndham Brand Defendants knew or should have known about the widespread trafficking at the Subject Super 8 based on:

a.  The obligation of hotel staff and franchisee to report suspected criminal activity, including sex trafficking, to the Wyndham Brand Defendants;

b.  The Wyndham Brand Defendants' regular monitoring of online reviews;

c.  The Wyndham Brand Defendants' collection and monitoring of customer surveys and complaints;

d.  The Wyndham Brand Defendants' requirement that franchisee submit regular and detailed reports to the Wyndham Brand Defendants about day-to-day hotel operations;

e.  The Wyndham Brand Defendants' collection and monitoring of data about guests at the Subject Super 8, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f.  The Wyndham Brand Defendants' supervision and control over day-to-day operations of the Subject Super 8 through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow the Wyndham Brand Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g.  The Wyndham Brand Defendants' regular inspections of the Subject Super 8;

h.  The Wyndham Brand Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;

i.  The Wyndham Brand Defendants' access to surveillance and security systems;

j.  Information provided to the Wyndham Brand Defendants by law enforcement; and

30

k.  Other sources of information available to the Wyndham Brand Defendants.

76.  Upon information and belief, under the Wyndham Brand Defendants' protocols, which on their face required hotel staff and franchisee to report suspected criminal activity to the Wyndham Brand Defendants, hotel staff and management were required to report and did report numerous instances of suspected sex trafficking to the Wyndham Brand Defendants prior to (A.S.F.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Subject Super 8.

77.  Upon information and belief, the Wyndham Brand Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the Subject Super 8 based on their supervision and monitoring of the property.

## C. Defendants knew Jane Doe (A.S.F.) was being trafficked at the Subject Super 8 because of the apparent and obvious "red flags" of sex trafficking.

78.  During the period that Jane Doe (A.S.F.) was trafficked at the Subject Super 8, there were obvious signs that her traffickers were engaged in sex trafficking:

a.  (A.S.F.) and her trafficker were warned by the hotel staff of any police in the area;

b.  The "Do Not Disturb" door hanger was used very frequently.

c.  Housekeeping staff was prevented from entering the room and Jane Doe and her trafficker would go to the front desk to request frequent towels and sheets.

d.  Jane Doe (A.S.F.) had several johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

e.  There was heavy foot traffic in and out of Jane Doe (A.S.F.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

f.  Jane Doe (A.S.F.) had visible signs of abuse which the hotel staff would have seen.

g.  Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

31

79.     Based upon information and belief, multiple employees at the Subject Super 8, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

80.     As such, Defendants knew or were willfully blind to the fact that Jane Doe (A.S.F.) was being trafficked at the Subject Super 8.

81.     Given these obvious signs, Wyndham Defendants and Franchisee Defendant knew or should have known about the trafficking of Jane Doe (A.S.F.) based on their policies or protocols that required hotel staff to report suspected criminal activity including sex trafficking.

82.     The Wyndham Defendants and Franchisee had constructive knowledge of the trafficking of (A.S.F.) at the Subject Super 8 because that trafficking was the direct result of the Wyndham Defendants and Franchisee facilitating trafficking at the Subject Super 8.

83.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham branded hotels, and at the Subject Super 8, Wyndham Defendants and Franchisee each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Subject Super 8 and to make a reasonable investigation in response to signs of potential sex trafficking. If the Defendants had used reasonable prudence, they would have been aware of Jane Doe (A.S.F.)'s trafficking at the Subject Super 8 and that they were benefiting from such trafficking.

IV.     **Defendants actively facilitated sex trafficking at the Subject Super 8, including the trafficking of Jane Doe (A.S.F.)**

84.     Wyndham Defendants and Franchisee Defendant had both actual and constructive knowledge of the trafficking of Jane Doe (A.S.F.) at the Subject Super 8 because the trafficking was the direct result of Defendants facilitating her trafficking at the properties.

    A.  **Franchisee facilitated the trafficking activity at the Subject Super 8, including the trafficking of (A.S.F.)**

32

85.    Franchisee Defendant is responsible for the acts, omissions, and knowledge of employees of the Subject Super 8 when operating these hotels because these acts and omissions were committed in the scope and course of employment, because Franchisee Defendant ratified these acts and omissions, and because Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee, of human trafficking occurring in the Subject Super 8.

86.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Super 8, Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

87.    Franchisee Defendant knew or was willfully blind to the fact that (A.S.F.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing them a venue in the form of hotel rooms and related services, to facilitate (A.S.F.)'s sexual exploitation.

88.    Franchisee also facilitated widespread trafficking at the Subject Super 8, including the trafficking of (A.S.F.), in ways including:

 a. developing relationships with traffickers, including (A.S.F.)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

 b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (A.S.F.) and other victims;

 c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

 d. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

 e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

33

f.   implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

g.   providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

h.   accommodating specific requests made by traffickers.

89.    Franchisee Defendant's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including (A.S.F.)

90.    Franchisee Defendant knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

91.    Policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Subject Super 8 by either Wyndham Defendants or Franchisee. (A.S.F.)'s trafficker was able to continue the trafficking venture at the Subject Super 8. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, (A.S.F.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Subject Super 8. Furthermore, had Franchisee Defendant properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, (A.S.F.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Subject Super 8.

**B. The Wyndham Brand Defendants facilitated the trafficking activity at the Subject Super 8, including the trafficking of (A.S.F.)**

92.    Upon information and belief, the Wyndham Brand Defendants participated directly in aspects of the operation of the subject Wyndham properties that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (A.S.F.), as follows:

a. assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with hotels on trafficking issues;

f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for guests to report security issues to franchisor;

h. requiring franchisees to provide Wi-Fi/internet access to guests;

i. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

j. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k. requiring franchisees to use a system to monitor and track housekeeping requests;

l. setting policies for when and how housekeeping services are provided;

m. collecting and monitoring data that shows patterns of use of housekeeping services;

35

n.  setting policies for when and how hotel staff can accept tips.

93.  Wyndham Brand Defendants directly participated in and retained day-to-day control over renting rooms at the Subject Super 8 by, among other things:

a.  controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b.  controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c.  requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d.  reserving rooms and accept payments without requiring franchisee approval or involvement;

e.  controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f.  requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g.  requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h.  requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i.  requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j.  ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k.  exercising control over the price of rooms;

l.  controlling all details of the customer loyalty program that the franchisee was required to implement;

m.  setting detailed policies for the check-in process, including requirements for identification and payment methods;

n. collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o. assuming sole ownership over all guest information;

p. overseeing do not rent (DNR) lists for its branded properties.

94. The Wyndham Brand Defendants had a direct business relationship with traffickers operating at the Subject Super 8 because, among other things, the Wyndham Brand Defendants directly rented rooms at the hotels, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the Wyndham Brand Defendants by developing brand loyalty and intentionally choosing Wyndham hotels because it was known they created a favorable environment for trafficking.

95. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham properties, Wyndham Brand Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (A.S.F.).

96. Wyndham Brand Defendants knew or should have known that Jane Doe (A.S.F.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (A.S.F.)'s sexual exploitation.

97. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Wyndham properties, the Wyndham Brand Defendants continued participating in a venture at that hotel, with its franchisees and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

c. adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d. adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e. providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at subject Super 8;

g. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

98. If Wyndham had exercised reasonable diligence when operating the Wyndham properties and in the areas where it retained control, Wyndham would have prevented the Wyndham properties from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (A.S.F.). Instead, Wyndham engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (A.S.F.).

99. The Wyndham Brand Defendants should have known about Jane Doe (A.S.F.)'s trafficking because it retained control over the training of the staff of the Subject Super 8 regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training

38

and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If the Wyndham Brand Defendants had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of (A.S.F.) at the Subject Super 8. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Wyndham Brand Defendants.

100.    The Wyndham Brand Defendants should have known about Jane Doe (A.S.F.)'s trafficking because they also retained control over the response of Wyndham hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, the Wyndham Brand Defendants facilitated sex trafficking, including the sex trafficking of (A.S.F.) in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Wyndham Brand Defendants.

101.    The Wyndham Brand Defendants also should have known about Jane Doe (A.S.F.)'s trafficking because they retained the control to adopt and enforce policies on sex trafficking for their properties, including Subject Super 8, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the Subject Super 8. The Wyndham Brand Defendants and allowed traffickers to access rooms for the purpose of harboring their victims, including Jane Doe (A.S.F.) Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Wyndham Brand Defendants.

102.    The Wyndham Brand Defendants also should have known about Jane Doe (A.S.F.)'s trafficking because they retained control over the security of the Subject Super 8 through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting the Subject Super

39

8. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the Wyndham Brand Defendants had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Wyndham Brand Defendants.

103.    Jane Doe (A.S.F.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the Wyndham Brand Defendants had used reasonable diligence in the aspects of hotel operations over which they retained control.

104.    Moreover, Jane Doe (A.S.F.)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the Subject Super 8 over an extended period because the Wyndham Brand Defendants adopted policies and practices that insulated Jane Doe (A.S.F.)'s trafficker from significant risk of detection or disruption.

## V.    Defendants' Ventures at the Subject Super 8

105.    Each of the Wyndham Brand Defendants generated substantial income from the Subject Super 8, receiving a share of the profits from room rentals collected at the hotel. The fees generated by the Wyndham Brand Defendants were primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' profits increased with each room rental at the Subject Super 8, including each room rented to a trafficker. Revenue generated from rooms rented at the Subject Super 8 was distributed among the Wyndham Brand Defendants, with each benefiting from each rental of a hotel room to a trafficker, including Jane Doe (A.S.F.)'s trafficker.

106.    Franchisee profited from every room rented to a trafficker or for use in trafficking at the Subject Super 8, both from the room fee and from fees for other hotel services.

40

107. In ways described more fully above, the Wyndham Brand Defendants and Franchisee knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the population of sex traffickers operating out of the Subject Super 8, including Jane Doe (A.S.F.)'s trafficker. (hereinafter "**Venture 1**").

108. The Wyndham Brand Defendants and Franchisee Defendant formed this continuous business relationship and implicit understanding with the traffickers at the Subject Super 8 by continuing to rent rooms to be used for trafficking (including (A.S.F.)'s trafficking) after the Wyndham Brand Defendants and Franchisee knew or should have known that the rooms were being used for unlawful trafficking.

109. This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Wyndham Brand Defendants and Franchisee Defendants were generating revenue by renting the hotel rooms.

110. This implicit understanding developed because sex traffickers, including Jane Doe (A.S.F.)'s trafficker, frequently used the Subject Super 8 for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Brand Defendants and Franchisees that created a favorable environment for sex trafficking to flourish.

111. Both the Wyndham Brand Defendants and Franchisee Defendant participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, Franchisee Defendant provided "boots on the ground" at the hotel, and the Wyndham Brand

41

Defendants played a primary role in renting rooms at the Subject Super 8 and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

112. The Wyndham Brand Defendants and Franchisee participated in the venture by continually renting rooms to traffickers, including Jane Doe (A.S.F.)'s, after they knew or should have known that victims like Jane Doe (A.S.F.) were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Subject Super 8 as a venue for their illegal activities.

113. Wyndham Brand Defendants and Franchisee Defendant did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

a. The population of traffickers, including Jane Doe (A.S.F.)'s, were familiar to the staff at the Subject Super 8;

b. These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Subject Super 8 but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

d. Defendants provided additional services to traffickers (including Jane Doe (A.S.F.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

e. The staff designated an area of the hotel for traffickers, which facilitated their illegal activities.

114. The criminal traffickers operating at the Subject Super 8 as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (A.S.F.)

115.    If Wyndham Brand Defendants and Franchisee Defendant had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from Jane Doe (A.S.F.)'s trafficking at Subject Super 8.

116.    In ways described more fully above, the Wyndham Brand Defendants and Franchisee also knowingly received a financial benefit from participating in a commercial hotel-operating venture at the Subject Super 8 (hereinafter "**Venture 2**").

117.    The Wyndham Brand Defendants and Franchisee had a longstanding business relationship pursuant to which they jointly participated in operation of the Subject Super 8 with a shared goal of maximizing revenue, including gross room revenue.

118.    The Wyndham Brand Defendants and Franchisee, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Subject Super 8 by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at this hotel.

119.    Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Subject Super 8, which resulted in Jane Doe (A.S.F.) and other victims being harbored, maintained, and provided in the rooms of the Subject Super 8. Venture 2 also engaged in a violation of the TVPRA through the actions of Franchisee Defendant who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

120.    Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Brand Defendants and Franchisee participated in the venture by continuing to operate the Subject Super 8 in a way that they knew

or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of (A.S.F.). The Wyndham Brand Defendants provided Franchisee Defendant with operational support, use of trademarks, marketing services, and other resources to operate the Subject Super 8 in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI. Franchisee Defendant and the Staff at the Subject Super 8 Acted as Actual Agents of Wyndham

121. Wyndham Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant and staff at the Subject Super 8, which are Wyndham Brand Defendants' actual agents or subagents.

122. The Wyndham Brand Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the subject Wyndham properties through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Brand Defendants as they oversaw and supervised hotel operations.

123. The Wyndham Brand Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Brand Defendants imposed on the franchisees:

    a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used; and

    b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

    c. dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions; and

44

    d.  significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

124.    In addition to the ways described above, upon information and belief, Wyndham Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the subject properties, including the following ways:

    a.  Wyndham Brand Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

    b.  Wyndham Brand Defendants maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site and at locations selected by Wyndham;

    c.  Wyndham Brand Defendants provided hotels staff with training it created through an online learning platform, Wyndham University, it controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

    d.  Wyndham Brand Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

    e.  Wyndham Brand Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

    f.  Wyndham Brand Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

    g.  Wyndham Brand Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

    h.  For certain products and services that franchisee was required to purchase to operate the property, Wyndham Brand Defendants designated approved vendors and prohibited franchisee from purchasing goods and services from anyone other than an approved vendor;

i. Wyndham Brand Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

j. Wyndham Brand Defendants set required staffing levels for the subject properties;

k. Wyndham Brand Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l. Wyndham Brand Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m. Wyndham Brand Defendants provided benefits for employees of franchised hotels;

n. Wyndham Brand Defendants controlled channels for guests to report complaints or provide feedback regarding the subject properties and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to require Franchisee Defendant to pay associated costs;

o. Wyndham Brand Defendants generated reports and analysis of guest complaints and online reviews for the subject properties;

p. Wyndham Brand Defendants set detailed requirements for insurance that Franchisee Defendant must purchase;

q. Wyndham Brand Defendants exercised or retained control over the franchisee's day-to-day accounting and banking practices;

r. Wyndham Brand Defendants regularly audited the books and records of Franchisee Defendant;

s. Wyndham Brand Defendants conducted frequent and unscheduled inspections of the subject properties;

t. Wyndham Brand Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of Wyndham' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject properties;

46

u. Wyndham Brand Defendants controlled all marketing for the subject properties, directly provided marketing services, and prohibited Franchisee Defendant from maintaining any online presence unless specifically reviewed and approved by Wyndham;

v. Wyndham Brand Defendants exercised or retained control over all aspects of building and facility design;

w. Wyndham Brand Defendants imposed detailed recordkeeping and reporting requirements on Franchisee Defendant regarding virtually all aspects of hotel operations;

x. Wyndham Brand Defendants supervised and controlled day-to-day operations of the subject properties through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendant to use;

y. Wyndham Brand Defendants required the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z. Wyndham Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

125. Upon information and belief, Wyndham Brand Defendants had the right to and did enforce its control over Franchisee Defendant through various methods, including:

a. the right to conduct detailed inspections of the subject properties;

b. monitoring or auditing the Franchisee Defendant for compliance with policies and expectations;

c. directing Franchisee Defendant to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. the right to impose fines or penalties;

g. the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

126.    The Wyndham Brand Defendants are also vicariously liable for Franchisee Defendant and the hotel staff because, as further described above, they retained and exercised control over the specific instrumentalities and aspects of operations that caused Jane Doe (A.S.F.)'s harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. They Wyndham Brand Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

## VII.    Wyndham Brand Defendants are jointly responsible for the trafficking of Jane Doe (A.S.F.)

127.    All the Wyndham Brand Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

128.    Upon information and belief, operation of the subject properties was part of a single unified operation by Wyndham Brand Defendants. Upon information and belief, all Wyndham Brand Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, Wyndham Brand Defendants acted jointly to own, operate, control, manage, and supervise the subject properties. As an integrated enterprise and/or joint venture, Wyndham Brand Defendants were separately and jointly responsible for compliance with all applicable laws.

## VIII.    Defendants are Jointly and Severally Liable for Jane Doe (A.S.F.)'s Damages.

48

129.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (A.S.F.).

130.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (A.S.F.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

131.    Jane Doe (A.S.F.) incorporates all other allegations.

**I.    Cause of Action: Beneficiary Liability under §1595(a) of the TVPRA (all Defendants).**

132.    Jane Doe (A.S.F.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

133.    Jane Doe (A.S.F.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

134.    All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendants knew or should have known was engaged in a violation of the TVPRA.

135.    **Venture 1:** Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating a venture with sex traffickers, including Jane Doe (A.S.F.)'s trafficker. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

a.  Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Subject Super 8 by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Subject Super 8 to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of (A.S.F.)

b.  This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including (A.S.F.), in the rooms of the Subject Super 8.

c.  Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

d.  Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including (A.S.F.)'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including (A.S.F.)). Each Defendant received a financial benefit every time a trafficker rented a room.

e.  Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including (A.S.F.)'s trafficking).

136.    **Venture 2**: Through acts and omissions more fully described throughout this Complaint, the Wyndham Defendants received a financial benefit from participating in Venture 2 with Franchisee Defendant operating the Subject Super 8. Each of the Wyndham Defendants violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

a.  Venture 2 is a commercial venture that resulted from the business relationship between each Wyndham Defendant during its respective time as franchisor for the Subject Super 8 and Franchisee Defendant to operate the Subject Super 8 with a common objective of maximizing revenue at the hotels, including gross room revenue.

b.  The venture violated the TVPRA through the widespread sex trafficking that occurred at the Subject Super 8, including the trafficking of (A.S.F.)

50

    c. Each Wyndham Defendant, at the relevant time, knew or should have known Venture 2 was engaged in violations of the TVPRA.

    d. Each Wyndham Defendant knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Subject Super 8, which increased every time a room was rented including rooms rented to traffickers.

    e. Each Wyndham Defendant, at the relevant time, participated in this venture by (1) continuing the ongoing business relationship with Franchisee Defendant despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

137. The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (A.S.F.)

**II.    Cause of Action: Vicarious Liability for TVPRA Violations (Franchisor Defendants).**

138. Franchisee Defendant acted as the actual agents of Wyndham Defendant when operating the Subject Super 8. The agency relationship between Franchisee Defendant and each Wyndham Defendant lasted for the period during which the Wyndham Defendants was involved in operation of the Subject Super 8 through its role as franchisor.

139. Through the acts and omissions described throughout this Complaint, each Wyndham Defendant, at the relevant time, exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Super 8.

140. Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

141. As a result of the relationship between Franchisee Defendant and Wyndham Defendants, Franchisors are vicariously liable for the acts of Franchisee, including at the Subject Super 8. Factors that support this allegation are that Franchisors shared profits, standardized

employee training, standardized and strict rules of operations, Franchisors controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Franchisors had the right to terminate any franchisee that failed to comply with the requirements promulgated by Franchisors. Thus, Franchisors retained control, or the right to control, the mode and manner of work contracted for.

142.   As alleged above, Franchisee Defendant is directly liable to Jane Doe (A.S.F.) for violations of the TVPRA as a beneficiary under 18 U.S.C §1595(a). The Wyndham Defendants are vicariously liable to Jane Doe (A.S.F.) for the same violation.

143.   Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Subject Super 8, enabled and contributed to the sex trafficking of (A.S.F.)

## DISCOVERY RULE

144.   To the extent Defendants assert an affirmative defense of limitations, Jane Doe (A.S.F.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

145.   Jane Doe (A.S.F.) was subject to continuous trafficking at the subject hotel through the end of February 2015, which is not more than 10 years before Jane Doe (A.S.F.) filed this lawsuit.

146.   This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the subject hotel and Defendants' ongoing venture with one another and with criminal traffickers.

## DAMAGES

52

147. Defendants' acts and omissions, individually and collectively, caused Jane Doe (A.S.F.) to sustain legal damages.

148. Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (A.S.F.).

149. Jane Doe (A.S.F.) is entitled to be compensated for personal injuries and economic damages, including:

a. Actual damages (until trial and in the future)

b. Incidental and consequential damages (until trial and in the future);

c. Mental anguish and emotional distress damages (until trial and in the future);

d. Lost earnings and lost earning capacity (until trial and in the future);

e. Necessary medical expenses (until trial and in the future);

f. Life care expenses (until trial and in the future);

g. Physical pain and suffering (until trial and in the future);

h. Physical impairment (until trial and in the future);

i. Emotional impairment (until trial and in the future);

j. Exemplary/Punitive damages;

k. Attorneys' fees; and

l. Costs of this action.

m. Pre-judgment and all other interest recoverable.

## **JURY TRIAL**

150. Jane Doe (A.S.F.) demands a jury trial on all issues.

## **RELIEF SOUGHT**

151.    WHEREFORE, Jane Doe (A.S.F.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (A.S.F.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (A.S.F.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**THE LOCKS LAW FIRM**

Dated: February 28, 2025

/s/ Francesca A. Iacovangelo
Francesca A. Iacovangelo, Esq.
601 Walnut Street, Suite 720 E
Philadelphia, PA 19106
(215) 893-3454
(215) 893-3444 Facsimile
fiacovangelo@lockslaw.com

**ATTORNEYS FOR PLAINTIFF**